## IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

_____

|  |  |  |
|---|---|---|
| ) | | |

**Cage Ranch Solar, LLC;**       )
**Cage Ranch Solar II, LLC,**      )
      )
    **Petitioners,**       )
      )
      **v.**       )     Case No.__23-1227____
      )
**Southwest Power Pool, Inc.,**     )
      )
    **Respondent.**       )
      )
_____)

## PETITION FOR REVIEW

Pursuant to 16 U.S.C. § 825*l*(b), Federal Rule of Appellate Procedure 15(a), and D.C. Circuit Rule 15, Cage Ranch Solar, LLC and Cage Ranch Solar II, LLC, (together, "Cage Ranch"), hereby petition the Court for review of the following orders issued by the Federal Energy Regulatory Commission:

1. *Cage Ranch Solar, LLC, et al. v. Southwest Power Pool, Inc.*, Docket No. EL22-89-000, "Order Denying Complaint and Waiver Request" 183 FERC ¶ 61,138 (May 23, 2023) ("Initial Order"); and

2. *Cage Ranch Solar, LLC, et al. v. Southwest Power Pool, Inc.*, Docket No. EL22-89-001, "Notice of Denial of Rehearing by Operation of Law

and Providing for Further Consideration," 184 FERC ¶ 62,049 (July 24, 2023) ("Rehearing Order").

On September 20, 2022, Cage Ranch filed a complaint regarding Southwest Power Pool, Inc.'s ("SPP") flawed interconnection studies and unjust, unreasonable, and unduly discriminatory calculation of security obligations for Cage Ranch's 900 MW solar generation facility along with a request for waiver of certain SPP tariff deadlines.

On May 23, 2023, FERC issued its Initial Order denying the complaint, finding that SPP's interconnection studies and its imposition of security obligations on Cage Ranch were just, reasonable, and not unduly discriminatory. FERC also denied the request for waiver of SPP tariff deadlines for complying with the security obligations.

On June 22, 2023, Cage Ranch timely sought rehearing of the Initial Order. The Commission thereafter issued the July 24, 2023 Rehearing Order, which does not address the substance of Cage Ranch's request for rehearing, but deems the request denied pursuant to 16 U.S.C. § 825*l*(a), 18 C.F.R. § 385.713, and this Court's decision in *Allegheny Def. Project v. FERC*, 964 F.3d 1 (D.C. Cir. 2020) (en banc).

Cage Ranch hereby petitions this Court for review of the Initial Order and the Rehearing Order, including on the grounds that FERC's orders (1) violate the Federal Power Act and the Administrative Procedure Act, and (2) are arbitrary and

capricious, an abuse of discretion, not supported by substantial evidence, not supported by reasoned decision-making, and otherwise contrary to law.

Because Cage Ranch's June 22, 2023 request for rehearing is deemed to have been denied on July 22, 2023, this petition for review is timely. Venue is proper under 16 U.S.C. § 825*l*(b). Copies of the challenged orders are attached as Attachments A and B.

Cage Ranch respectfully requests that the Court hold unlawful, vacate, enjoin, and set aside the Commission's orders and grant such further relief as may be appropriate.

> Respectfully submitted,
>
> /s/ *James E. Tysse*
> James E. Tysse
> Stephen J. Hug
> Benjamin N. Reiter
> AKIN GUMP STRAUSS HAUER & FELD LLP
> 2001 K Street, N.W.
> Washington, D.C. 20006
> Telephone: (202) 887-4000
> Facsimile: (202) 887-4288
> jtysse@akingump.com
> shug@akingump.com
> breiter@akingump.com

August 22, 2023

## CORPORATE DISCLOSURE STATEMENT

In accordance with Rule 26.1 of the Rules of this Court, Cage Ranch Solar, LLC and Cage Range Solar II, LLC provide the following disclosure statement:

Cage Ranch Solar, LLC is in the business of developing, owning, and operating a solar project under development in Lamb County, Texas. Cage Ranch Solar, LLC is an indirect, wholly owned subsidiary of National Grid plc. National Grid plc is a public company organized under the laws of England and Wales, with ordinary shares listed on the London Stock Exchange, and American Depositary Shares listed on the New York Stock Exchange. No publicly held corporation directly owns more than 10 percent of National Grid plc's outstanding ordinary shares.

Cage Range Solar II, LLC is in the business of developing, owning, and operating a solar project under development in Lamb County, Texas. Cage Ranch Solar II, LLC is an indirect, wholly owned subsidiary of National Grid plc. National Grid plc is a public company organized under the laws of England and Wales, with ordinary shares listed on the London Stock Exchange, and American Depositary Shares listed on the New York Stock Exchange. No publicly held corporation directly owns more than 10 percent of National Grid plc's outstanding ordinary shares.

Respectfully submitted,

/s/ *James E. Tysse*
James E. Tysse
Stephen J. Hug
Benjamin N. Reiter
AKIN GUMP STRAUSS HAUER & FELD
LLP
2001 K Street, N.W.
Washington, D.C. 20006
Telephone: (202) 887-4000
Facsimile: (202) 887-4288
jtysse@akingump.com
shug@akingump.com
breiter@akingump.com

## CERTIFICATE OF SERVICE

Pursuant to F.R.A.P. 15(c) and 25(d), I hereby certify that I caused the foregoing Petition for Review to be served upon the Secretary of the Federal Energy Regulatory Commission and the Office of the Solicitor of the Federal Energy Regulatory Commission at the following addresses:

> Ms. Kimberly D. Bose, Secretary
> Federal Energy Regulatory Commission
> 888 First St., NE
> Washington, DC 20426

> Robert H. Solomon, Solicitor
> Federal Energy Regulatory Commission
> 888 First Street, N.E.
> Washington, D.C. 20426

Pursuant to 18 C.F.R. § 385.2012 and 28 U.S.C. § 2112(a), I further certify that I will mail a date-stamped copy of this petition to the Office of the Secretary, Federal Energy Regulatory Commission, 888 First Street, N.E., Washington, DC 20426.

Pursuant to F.R.A.P. 15(c), I further certify that I caused the foregoing document to be served by e-mail on all the parties on the Commission's service list for Docket Nos. EL22-89-000 and EL22-89-001, which is attached hereto.

Respectfully submitted,

/s/ *James E. Tysse*
James E. Tysse

# ATTACHMENT A

183 FERC ¶ 61,138
UNITED STATES OF AMERICA
FEDERAL ENERGY REGULATORY COMMISSION

Before Commissioners:  Willie L. Phillips, Acting Chairman;
James P. Danly, Allison Clements,
and Mark C. Christie.

Cage Ranch Solar, LLC                               Docket No.  EL22-89-000
Cage Ranch Solar II, LLC

v.

Southwest Power Pool, Inc.

ORDER DENYING COMPLAINT AND WAIVER REQUEST

(Issued May 23, 2023)

1.     On September 20, 2022, as amended on February 13, 2023, pursuant to sections
206, 306, and 309 of the Federal Power Act (FPA)[1] and Rules 206 and 207(a)(5) of the
Commission's Rules of Practice and Procedure,[2] Cage Ranch Solar, LLC and Cage Ranch
Solar II, LLC (collectively, Cage Ranch) filed:  (1) a complaint against Southwest Power
Pool, Inc. (SPP) related to SPP's interconnection studies of Cage Ranch's planned solar
generating facility (Project); and (2) a request for waiver of sections 3.7 (Withdrawal) and
8.5.2 (Decision Point 2) of Attachment V (Generator Interconnection Procedures (GIP)) of
SPP's Open Access Transmission Tariff (Tariff).[3]  As discussed below, we deny Cage
Ranch's amended complaint and waiver request.

## I.     __Background__

2.     Under SPP's three-stage generator interconnection study process, the interconnection
customer submits an executed generator interconnection study agreement as part of its
interconnection request to enter SPP's generator interconnection queue prior to the close of

---

[1] 16 U.S.C. §§ 824e, 825e, 825h.

[2] 18 C.F.R. §§ 385.206, 207(a)(5) (2022).

[3] SPP Tariff, attach. V, §§ 3.7 (Withdrawal) (14.0.0), 8.5.2 (Decision Point 2)
(12.0.0).

the Definitive Interconnection System Impact Study (DISIS) queue cluster window, which is followed by a month-long review period.[4]  Each stage of the study process is followed by a Decision Point, which is a period of 15 business days during which the interconnection customer may review the study results from the previous phase, ask questions, receive responses, and decide whether to withdraw its request or proceed to the next phase.  Decision Point 1 follows DISIS Phase 1, and Decision Point 2 follows DISIS Phase 2.[5]

3.     SPP's GIP requires the interconnection customer to post financial security within 15 business days of SPP's release of DISIS Phase 1 and DISIS Phase 2 results.[6]  If the interconnection customer does not post financial security within the required period, SPP deems the interconnection request to be withdrawn and provides the interconnection customer with written notice that the interconnection customer has 15 additional business days to either cure the deficiency or notify SPP of its intent to pursue dispute resolution under the Tariff.  Withdrawal results in the loss of the interconnection customer's queue position and may result in the forfeiture of financial security payment deposits.[7]

4.     GIP section 8.14 sets forth the financial security milestone payment forfeiture and refund eligibility criteria.  In general, an interconnection customer's financial security milestone payments are subject to forfeiture if the customer's withdrawal would increase interconnection costs allocated to concurrently or lower-queued interconnection customers.  Specifically, GIP section 8.14.d provides that the first financial security (FS1) milestone payment is subject to forfeiture if the interconnection request is withdrawn after Decision Point 1.  Further, GIP section 8.14.e provides that the FS2 and FS3 payments are subject to forfeiture for withdrawals after Decision Point 2.  However, the financial security payments are refundable if they are not needed to make other interconnection customers whole due to the withdrawal, or if the withdrawing

---

[4] Capitalized terms used but not otherwise defined in this order have the meanings ascribed to them in the Tariff.

[5] SPP Tariff, attach. V, § 4.2.1 (5.0.0); *id*. § 8 (12.0.0).

[6] *Id.* §§ 8.5.1, 8.5.2.  GIP section 8.5.2 provides that the interconnection customer must provide the following four items to SPP prior to the end of Decision Point 2 in order for the interconnection customer to retain the assigned queue position for its interconnection request:  (1) a written indication of the customer's intent either to withdraw its request or proceed to the interconnection facilities study; (2) if applicable, a written indication of a reduction in the requested capacity, as permitted under GIP section 4.4.1; (3) if applicable, written indication that the requested commercial operation date will be extended or that the interconnection customer seeks to proceed under limited operation; and (4) the posting of a third financial security deposit.

[7] *Id.* § 3.7 (14.0.0).

interconnection customer's estimated costs increased by a certain percentage threshold between the applicable studies.[8]

5.      Cage Ranch is developing its 900 MW Project in Lamb County, Texas. Cage Ranch submitted two interconnection requests to SPP requesting interconnection to transmission facilities owned by Southwestern Public Service Company (SPS) and operated by SPP. Cage Ranch's interconnection requests were assigned to Group 5 of the DISIS-2017-002 study cluster (Group 5).[9]

6.      On December 20, 2021, SPP posted the initial draft results of the DISIS Phase 1 study for the DISIS-2017-002 study cluster.[10] On February 18, 2022, SPP posted the results of DISIS Phase 1 study. As part of the DISIS Phase 1 study, the Project was assigned approximately $302 million in network upgrade costs.[11]

7.      On March 1, 2022, at the SPP Transmission Working Group meeting, which occurred during Decision Point 1, SPP approved a new fuel-based dispatch method for use in interconnection studies. The fuel-based dispatch method became effective for Phase 2 of the DISIS-2017-002 study cluster.[12]

8.      Cage Ranch posted its FS2 payment in the amount of $4.19 million necessary to maintain its queue positions and transition to Phase 2 of the study process.[13] The DISIS Phase 2 study included a study of the impact of 97 interconnection requests, totaling over 19,500 MW of proposed new generation to the SPP footprint.[14] On August 15, 2022, SPP posted the initial draft results of the DISIS Phase 2 study. On August 29, 2022, SPP posted the results of the DISIS Phase 2 study. As part of the DISIS Phase 2 study, the Project was assigned approximately $311 million in network upgrade costs.[15]

---

[8] *Id.* § 8.14 (12.0.0).

[9] Cage Ranch Complaint and Waiver Request at 4, 9.

[10] *Id.* at 8.

[11] *Id.* at 10.

[12] *Id.* at 10-11.

[13] *Id.* at 11.

[14] *See* SPP, DISIS-2017-002 Phase 2 Powerflow, Stability and Short Circuit Final Results (Aug. 29, 2022), https://opsportal.spp.org/Studies/GenList?yearTypeId=154.

[15] Cage Ranch Complaint and Waiver Request at 11-13.

9.       Decision Point 2 commenced on August 30, 2022.  Under the Tariff, an interconnection customer had until September 20, 2022, to post its FS3 payment, which is equal to 20% of the total network upgrade costs allocated through the DISIS Phase 2 study to retain its queue positions.  Accordingly, Cage Ranch was required to post its FS3 payment in the amount of approximately $60 million to retain its queue positions.[16]  Cage Ranch did not post its FS3 payment by the Decision Point 2 deadline of September 20, 2022, nor did Cage Ranch cure its failure to post its FS3 payment within 15 business days; therefore, SPP deemed Cage Ranch's interconnection requests to be withdrawn.

## II.       **Cage Ranch's Complaint and Waiver Request**

10.       Cage Ranch states that it is filing its complaint to challenge SPP's use of a defective study model to assign interconnection costs and calculate the security obligations of its Project and other interconnection customers within the DISIS-2017-002 study cluster.  Cage Ranch argues that, based on its review of the study models used as the basis for the DISIS Phase 1 and DISIS Phase 2 studies, Cage Ranch identified material defects that cast doubt over the reliability and accuracy of SPP's DISIS Phase 2 study.  Cage Ranch argues it is neither just nor reasonable to assign network upgrade costs based on a defective study model.  As such, Cage Ranch asks the Commission to direct SPP to resolve the defects in the study model used for the evaluation of the Project, allow interconnection customers to post security after SPP resolves the defects, and require SPP to restore the queue positions of those interconnection customers in the DISIS-2017-002 study cluster that withdrew during Decision Point 2 or were deemed withdrawn due to a failure to post security, if they post security within 15 business days of SPP issuing an updated and corrected DISIS Phase 2 study.[17]

11.       In addition, Cage Ranch requests waiver of sections 3.7 and 8.5.2 of the Tariff to provide Cage Ranch with an extension of the Decision Point 2 deadline until such time that the Commission has resolved this complaint and SPP issues an updated and corrected DISIS Phase 2 study.[18]

## III.       **Notices and Responsive Pleadings**

12.       Notice of Cage Ranch's filing was published in the *Federal Register*, 87 Fed. Reg. 58,780 (Sept. 28, 2022), with interventions and protests due on or before October 11, 2022.  Timely motions to intervene were filed by:  SPP; Evergy Kansas

---

[16] *Id.* at 13.

[17] *Id.* at 2, 26; *see also* Cage Ranch Amended Complaint and Waiver Request at 25.

[18] Cage Ranch Complaint and Waiver Request at 3.

Central, Inc., Evergy Metro Inc., and Evergy Missouri West, Inc.; American Electric Power Service Corporation; Invenergy Wind Development North America LLC and Invenergy Solar Development North America LLC; Xcel Energy Services Inc.; 1000 Mile Solar, LLC (1000 Mile Solar); Solar Energy Industries Association; and Omaha Public Power District.  On October 11, 2022, SPP filed an answer to the complaint and protest to the waiver request.  On October 12, 2022, Savion, LLC (Savion) filed a motion to intervene out-of-time.

13.    On November 3, 2022, Cage Ranch filed a motion to hold this proceeding in abeyance pending settlement discussions with SPP.  Cage Ranch represented in that motion that SPP did not oppose its motion, and that it was working with SPP to resolve the issues raised in this proceeding through dispute resolution under GIP section 3.7.

14.    On November 18, 2022, 1000 Mile Solar filed comments requesting that the Commission issue an order permitting 1000 Mile Solar to participate in the Cage Ranch-SPP dispute resolution process.  1000 Mile Solar asserts that resolution of the complaint via dispute resolution could affect 1000 Mile Solar because it is part of the DISIS-2017-002 study cluster.[19]

15.    On December 8, 2022, Cage Ranch filed a motion to resume this proceeding, explaining that SPP and Cage Ranch have terminated dispute resolution proceedings. Cage Ranch also argues that because SPP and Cage Ranch have abandoned efforts to engage in dispute resolution, 1000 Mile Solar's request is moot.[20]

16.    On February 13, 2023, Cage Ranch filed an answer, and an amended complaint and waiver request.

17.    Notice of Cage Ranch's amended complaint and waiver request was published in the *Federal Register*, 88 Fed. Reg. 10,507 (Feb. 21, 2023), with interventions and protests due on or before March 6, 2023.  On March 6, 2023, SPP filed an answer to the amended complaint and waiver request.  On March 20, 2023, 1000 Mile Solar filed an answer to SPP's March 6, 2023 answer.  On March 24, 2023, Cage Ranch filed an answer to SPP's and 1000 Mile Solar's answers.

---

[19] 1000 Mile Solar Comments to Complaint at 1-4.

[20] Cage Ranch Motion to Complaint at 1-2.

## IV.    Discussion

### A.    Procedural Matters

18.    Pursuant to Rule 214 of the Commission's Rules of Practice and Procedure, 18 C.F.R. § 385.214 (2022), the timely, unopposed motions to intervene serve to make the entities that filed them parties to this proceeding.

19.    Pursuant to Rule 214(d) of the Commission's Rules of Practice and Procedure, 18 C.F.R. § 385.214(d), we grant Savion's late-filed motion to intervene given its interest in the proceeding, the early stage of the proceeding, and the absence of undue prejudice or delay.

20.    Rule 213(a)(2) of the Commission's Rules of Practice and Procedure, 18 C.F.R. § 385.213(a)(2) (2022), prohibits an answer to an answer unless otherwise ordered by the decisional authority.  We accept 1000 Mile Solar's and Cage Ranch's answers because they have provided information that assisted us in our decision-making process

### B.    Substantive Matters

21.    As discussed below, we deny Cage Ranch's amended complaint and waiver request.  In addition, because SPP and Cage Ranch terminated dispute resolution proceedings, we find that 1000 Mile Solar's request to participate in that process is moot.

#### 1.    Complaint

##### a.    Cage Ranch's Complaint

22.    Cage Ranch argues that SPP's decision to finalize the DISIS Phase 2 study and assign interconnection costs based on a defective study model is unjust and unreasonable. Cage Ranch states that following the preliminary draft results of the DISIS-2017-002 Phase 2 study, it obtained the study cases used by SPP.  Cage Ranch asserts that it conducted a contingency analysis of the pre-transfer case used by SPP in the DISIS Phase 2 study to evaluate the interconnection requests in the DISIS-2017-002 study cluster and identified almost 800 instances of non-convergence.  Cage Ranch contends that in a power flow model, non-convergence means that the flows over an element of the transmission system are incorrect or cannot be determined by the model.  Cage Ranch asserts that non-convergence can result from a range of factors, including latent errors in the model, system instability, and reliability issues, such as voltage collapse.  Cage Ranch argues that the presence of non-convergence in the pre-transfer case means that the baseline state of the system that is used to evaluate the potential impact of the

interconnection requests in the DISIS-2017-002 study cluster contains errors and is unstable and unreliable.[21]

23.  According to Cage Ranch, one of SPP's primary justifications for implementing a fuel-based dispatch method was to reduce the frequency of non-convergence in SPP's study models by eliminating implausible dispatch levels in favor of more realistic assumptions that better aligned with those employed by SPP in the transmission planning process.  In addition, Cage Ranch argues that the DISIS Manual acknowledges that study models should be brought to a "convergence baseline" prior to assigning interconnection customers costs for contingent overloads.[22]  Cage Ranch also contends that SPP's Model Development Procedure Manual acknowledges that the base case should represent a "converged load flow case with as few violations and questionable data items as possible."[23]

24.  Cage Ranch argues that SPP ignored Cage Ranch's concerns of non-convergence and finalized the DISIS Phase 2 study results, which then triggered Decision Point 2, resulting in interconnection customers being required to post at-risk financial security equal to 20% of the interconnection costs identified in the DISIS Phase 2 study to retain their queue positions.  Cage Ranch contends that SPP's failure to resolve the non-convergence issues that Cage Ranch identified prior to finalizing the DISIS Phase 2 study means that SPP's assessment is unrealistic and fails to accurately identify the reliability issues associated with the interconnection requests in the DISIS-2017-002 study cluster.  Cage Ranch alleges that resolving the non-convergence issues would have a profound impact on every aspect of the study, including the way power flows over the transmission system from existing and new resources, line ratings, and voltage conditions.[24]

25.  According to Cage Ranch, the Commission has recognized the importance of ensuring that the study models used in the generator interconnection study process represent a reasonable approximation of expected system conditions.  Cage Ranch argues that the Commission has acknowledged that relying on inaccurate models or study assumptions can result in the interconnection study process misidentifying the reliability issues caused by an interconnection customer's interconnection and inappropriately

---

[21] Cage Ranch Complaint and Waiver Request at 12-14.

[22] *Id.* at 14 (citing SPP DISIS Manual, Version 1.6 § 3.2.2.1 (Apr. 2022)).

[23] *Id.* at 14-15 (citing SPP Model Development Procedure Manual, Version 5 at 4 (July 2021)).

[24] *Id.* at 15-16.

assigning costs.[25]  Cage Ranch alleges that conducting a study based on a model that contains non-convergence can have the effect of overestimating the impact of the interconnection customers in Group 5, and that the level of non-convergence may be playing a role in the costs allocated to each interconnection customer.[26]

26.    Cage Ranch states that, after finalizing the DISIS Phase 2 study, SPP sent an email replying to the concerns Cage Ranch had raised.  Cage Ranch alleges that in the email, SPP dismissed Cage Ranch's concerns on the basis that the DISIS study was not designed to resolve base-case related issues and, instead, is intended to capture the impact of study projects on the SPP transmission system.  According to Cage Ranch, SPP added that it was possible that incidents of non-convergence were associated with higher-queued generating facilities that may not have met the criteria for cost allocation but had an impact on the constraints.[27]

27.    Cage Ranch contends that SPP's response is flawed for several reasons.  First, Cage Ranch argues that relying on a study model that is not a reasonably accurate representation of anticipated system conditions means that reliability issues created by certain new resources may go overlooked and unaddressed.  Second, Cage Ranch argues that a study model that contains hundreds of incidents of non-convergence is incapable of providing an accurate assessment of the impact that interconnection customers will have on the transmission system, and as a result, interconnection cost allocation based on a defective study is defective as well.  Third, Cage Ranch alleges that non-convergence can have multiple causes, many of which do not have any relationship to the impact of *de minimis* impacts from higher-queued generating facilities, such as inadvertent errors, incorrect parameters, sign conventions, and other issues.[28]

28.    In addition, Cage Ranch contends that SPP attempted to minimize the significance of the non-convergence issues identified by Cage Ranch because those issues were identified through a contingency analysis.  According to Cage Ranch, SPP claims that the non-convergence is irrelevant because SPP did not conduct a contingency analysis as part of the DISIS Phase 2 study.  Cage Ranch contends that a contingency analysis is an important tool for evaluating whether a study case represents a reasonable representation

---

[25] *Id.* at 16 (citing *Midwest Indep. Transmission Sys. Operator, Inc.*, 141 FERC ¶ 61,068, at P 50 (2012); *Midwest Indep. Transmission Sys. Operator, Inc.*, 146 FERC ¶ 61,013, at P 22 (2014); *Midwest Indep. Transmission Sys. Operator, Inc.*, 135 FERC ¶ 61,222, at P 24 (2011)).

[26] *Id.* at 16-17.

[27] *Id.* at 17-18.

[28] *Id.* at 18-19.

of system conditions, which is why SPP conducts such an analysis during the model building process to validate and identify errors when building its base case.[29]

29.     Cage Ranch contends that SPP has a duty under the Tariff and Commission precedent to do more than generate a study that it can use to assign interconnection costs. Cage Ranch argues that, to support an allocation of costs to interconnection customers, a public utility must demonstrate that the costs allocated to customers are consistent with cost causation principles.  Cage Ranch alleges that these principles preclude SPP from allocating billions of dollars in interconnection costs based on a study model that includes material errors and does not represent a reasonable reflection of real system conditions.[30]

30.     Cage Ranch argues that requiring interconnection customers to post security based on a defective DISIS Phase 2 study is unjust and unreasonable.  Cage Ranch alleges that SPP's reliance on a study model that includes pervasive non-convergence issues severs any link between the amount of the financial security required and the costs of the network upgrades that are necessary to accommodate the interconnection of the Project. Cage Ranch contends that it is highly likely that the use of a pre-transfer case that contains pre-existing unsolvable constraints and voltage collapse prior to the interconnection of the DISIS-2017-002 study cluster projects significantly overestimates the reliability impact of the projects and the network upgrades necessary to accommodate their interconnections.  Cage Ranch alleges that the result is to artificially and inappropriately inflate the amount of financial security that these interconnection customers need to post to maintain their queue positions, which effectively requires these interconnection customers to make excessive financial commitments.  Cage Ranch also states that, while it is optimistic that resolving the non-convergence issues it identified would reduce the overall costs assigned to interconnection customers in the DISIS-2017-002 study cluster, there is no way to predict how resolving these issues would affect the final study results.[31]

31.     Cage Ranch also argues that the assignment of interconnection costs based on a defective study model violates the Tariff and is prohibited by the filed rate doctrine. According to Cage Ranch, the Tariff requires SPP to conduct interconnection studies using a model that reasonably reflects anticipated system conditions, such that it can accurately identify the network upgrades necessary for a particular customer's interconnection.[32]  Cage Ranch argues that a study that is premised on a model that

---

[29] *Id.* at 19-20.

[30] *Id.* at 20-21.

[31] *Id.* at 22-23.

[32] *Id.* at 23-24 (citing SPP Tariff, attach. V, §§ 1, 2.4, 8.4.2).

contains close to 800 instances of non-convergence is unrealistic and incapable of providing an accurate assessment of the impact that a generator will have on the transmission system. Cage Ranch contends that until these issues are corrected, SPP lacks any basis under the Tariff to assign these interconnection costs to the Project.[33]

32.     Cage Ranch argues that, similarly, the Tariff does not grant SPP authority to enforce a financial security requirement based on a defective study model. Cage Ranch alleges that while GIP section 8.5.2 states that the financial security due from an interconnection customer shall be equal to 20% of the costs identified in the DISIS Phase 2 study, this requirement must be read considering the scope of the DISIS Phase 2 study, which is to identify the network upgrades that are necessary to resolve reliability issues arising from an interconnection customer's interconnection.[34] Cage Ranch contends the costs allocated to the Project do not reflect actual network upgrade costs, given that they are based on a study conducted using a defective pre-transfer case.[35]

33.     In addition, Cage Ranch argues that requiring it to post $60 million in additional financial security, without first being able to meaningfully challenge the accuracy of the study, is fundamentally inconsistent with the notice requirements of the FPA. According to Cage Ranch, the FPA is premised on the expectation that customers will be given prior notice of the rates, terms, and conditions of Commission-jurisdictional service, and can challenge those rates through an open and transparent Commission process.[36]

34.     Cage Ranch states that it seeks an order from the Commission that requires SPP to meaningfully engage with, and work to resolve, the non-convergence issues identified by Cage Ranch. Cage Ranch clarifies that it is not asking the Commission to adjudicate whether the costs of resolving any specific incidence of non-convergence in the pre-transfer case can be assigned to interconnection customers. Cage Ranch also requests that the Commission direct SPP to provide interconnection customers the ability to post financial security after SPP resolves the non-convergence issues described above and issues a revised DISIS Phase 2 study. Finally, Cage Ranch asserts that, to the extent that interconnection customers in the DISIS-2017-002 study cluster withdrew during Decision Point 2 or had their interconnection queue positions terminated due to a failure to post financial security, SPP should be required to restore these interconnection customers'

---

[33] *Id.* at 24.

[34] *Id.* (citing SPP Tariff, attach. V, § 8.5.2).

[35] *Id.*

[36] *Id.* at 25.

queue positions if the interconnection customer posts security within 15 business days of SPP's issuance of the revised DISIS Phase 2 study.[37]

### b.    SPP's Answer to Complaint

35.    SPP argues that all network upgrades assigned to the Project were determined by SPP using the processes set forth in the Tariff, the DISIS Manual, and SPP's Business Practices.[38]  According to SPP, when it conducts impact studies for interconnection requests, it starts with its Integrated Transmission Planning (ITP) reliability assessment models as the base case.  SPP states that it then adds all prior-queued generators to the base case to develop a pre-transfer case.  SPP states that the interconnection requests being evaluated for the current impact study are then added to the pre-transfer case to establish the transfer case.[39]

36.    SPP argues that, despite its repeated attempts to educate Cage Ranch on SPP's generator interconnection study processes, Cage Ranch fundamentally misunderstands SPP's study process and wishes to avoid properly assigned network upgrade costs.  SPP asserts that Cage Ranch performed its own contingency analysis on the pre-transfer case, which is inappropriate and beyond the scope of what SPP includes in its study process.  According to SPP, the pre-transfer case is used to reach a feasible dispatch solution prior to the addition of the generators in the current study; that is, the pre-transfer case is verified to be feasible under system intact conditions.[40]  SPP argues that the pre-transfer case is not studied for performance under contingency because it is only used to transition from the prior cluster study to the new cluster study, and those system conditions are not relevant for accommodating the interconnection service of the previous cluster.[41]

37.    SPP argues that once the pre-transfer case has been created, the transfer case is developed with the addition of new interconnection requests from the current cluster study group by modeling those interconnection requests at their full amount of requested interconnection service and dispatching down prior-queued and legacy generation.  SPP asserts that the transfer case is what SPP uses to determine whether additional network

---

[37] *Id.* at 25-26.

[38] SPP Answer to Complaint at 3.

[39] *Id.* at 5.

[40] System intact means the "transmission system with all circuits intact."  DISIS Manual § 2 (Definitions).

[41] SPP Answer to Complaint at 5-8 (citing DISIS Manual § 3.2.1.1).

upgrades are required to accommodate the requested amount of interconnection service from interconnection customers in the current study cluster.[42]

38.    SPP notes that Cage Ranch points to the DISIS Manual and a reference that study cases should be brought to a "convergence baseline."  SPP contends that Cage Ranch omits the next part of that sentence that reads "so that contingency analysis can be conducted."[43]  SPP contends that its study procedures contemplate having its study models converge under system intact conditions.  According to SPP, the base case used in the DISIS-2017-002 study did not have instances of non-convergence or errors.[44]

39.    In addition, SPP asserts that Cage Ranch overlooks several causes of non-convergence that are not errors, which include:  (1) a line whose impedance is very small as compared to that of a line connected in series with it; (2) an impedance value whose magnitude is extremely large; (3) a system's regulating bus is in a different system; (4) the radial system is very large; (5) extremely low voltage schedules; (6) zero or very low reactance branches; (7) a conservation solution tolerance; and (8) a conservative iteration limit based on the user's configuration used in the power flow software.  SPP contends that Cage Ranch does not identify an actual error in the DISIS-2017-002 study, such as an incorrect impedance value, a line that is connected to the wrong bus, or a generator outside its limits.[45]

40.    SPP argues that the system intact non-convergence issues identified in the DISIS Phase 1 pre-transfer case were resolved in the DISIS Phase 2 pre-transfer case and that there were no network upgrades assigned to interconnection customers in the DISIS Phase 2 study because of system intact non-convergence issues.  SPP asserts that, when conducting the DISIS Phase 1 study, SPP dispatched prior-queued and legacy generators at 100% in scenarios involving the study of wind and solar resources.  SPP states that these dispatch assumptions resulted in scenarios in which the model solution would not converge due to enormous amounts of excess generation within each study group.  According to SPP, to resolve this issue, it adopted a fuel-based dispatch method for use in interconnection studies, which represents a more plausible dispatch assumption in setting up the models because prior-queued generation is set to an initial dispatch that better reflects its fuel-type performance characteristics given the modeled seasons and system

---

[42] *Id.* at 8-9.

[43] *Id.* at 9 (citing DISIS Manual § 3.2.2.1).

[44] *Id.* at 9-10.

[45] *Id.* at 11 (citing Model Development Procedure Manual at 50).

conditions.[46]  SPP states that it informed Cage Ranch that the non-convergence issues in the pre-transfer case for the DISIS Phase 1 study would be eliminated in the DISIS Phase 2 study due to the implementation of the fuel-based dispatch method.  SPP asserts that consistent with its representation to Cage Ranch, those non-convergence issues were resolved and there were no upgrades assigned to interconnection customers in the DISIS Phase 2 study because of non-convergence issues under system intact conditions.[47]

41.    SPP argues that consistent with GIP section 8.2, it calculated Cage Ranch's FS2 and FS3 payments based on the network upgrades assigned to the Project.  SPP asserts that Cage Ranch has not alleged that SPP miscalculated the financial security owed by Cage Ranch.  Further, SPP contends that the FS3 payment amount is valid because SPP followed the Tariff and Business Practices when conducting the DISIS Phase 2 study and the underlying study models were not defective.[48]

42.    Finally, SPP argues that its assignment of interconnection costs does not violate the filed rate doctrine because its study models were not defective.  SPP also contends that it did not violate the notice requirements of the FPA because the processes and requirements used by SPP to build models and conduct interconnection studies are found in the Tariff, Business Practices, and DISIS Manual, which are posted publicly.  In addition, SPP asserts that it posted the initial draft results of the DISIS Phase 2 study on August 15, 2022, hosted a meeting with interconnection customers to review the results prior to posting the final DISIS Phase 2 study results, and engaged with Cage Ranch to resolve its concerns, which provided Cage Ranch sufficient notice.[49]

### c.    Cage Ranch's Amended Complaint

43.    Cage Ranch amends its complaint to provide additional detail to support its argument that the non-convergence issues had a direct impact on the network upgrade costs assigned to Group 5.  Specifically, Cage Ranch alleges that, as a result of the DISIS Phase 2 study, SPP assigned Cage Ranch approximately $43 million out of a total of $108.5 million in network upgrade costs assigned to Group 5, which are associated with the construction of the Crossroads to Yoakum 345 kV line and Eddy County 345 kV reactive support (Crossroads-Eddy County Upgrades).  Cage Ranch contends that the Crossroads-Eddy County Upgrades were necessary to address non-convergence in the transfer case associated with voltage collapse arising from the loss of the Crossroads to

---

[46] *Id.* at 13-14.

[47] *Id.* at 14-15.

[48] *Id.* at 15-16.

[49] *Id.* at 16-18.

Eddy County transmission line.  According to Cage Ranch, the Crossroads contingency observed in the transfer case is one of numerous contingencies that lead to non-convergence or voltage collapse in the pre-transfer case, which means that the study model cannot reach a valid solution.  Cage Ranch also argues that the incorporation of the Group 5 projects into the study model does not increase the extent of non-convergence or materially change the outcome.[50]

44.    Cage Ranch alleges that SPP's decision to ignore issues present in the pre-transfer case does not mean that these issues did not exist or impact the allocation of network upgrade costs to Group 5.  Cage Ranch also argues that SPP's practice of not performing a contingency analysis of the pre-transfer case is unjust and unreasonable and stands in contrast to the practices of Midcontinent Independent System Operator, Inc. (MISO), which performs a contingency analysis on the pre-transfer and transfer cases.[51]

45.    Cage Ranch alleges that SPP's arguments that any non-convergence that may exist is not present in the base case are undercut by SPP's acknowledgement that its 2021 ITP base case models, which Cage Ranch alleges are the same models used for the DISIS Phase 2 study, contained significant non-convergence, thermal overloads, and voltage support issues under both system intact and contingency conditions.  Cage Ranch argues that the 2021 ITP report notes that the loss of generation within the SPS area where the Group 5 projects are located, coupled with the Crossroads contingency, leads to voltage collapse, causing the base case models to "blow up."  Cage Ranch contends that a study model in which the loss of a line leads to voltage collapse is not stable under both system intact and contingency conditions, does not reasonably reflect actual system conditions, and will overestimate the reliability impact of the interconnection customers under evaluation.[52]

46.    Cage Ranch argues that SPP should have resolved the non-convergence issues prior to conducting the DISIS Phase 2 study.  Cage Ranch asserts that, as part of the 2021 ITP process, SPP concluded that the non-convergence associated with the loss of the Crossroads contingency should be resolved through the construction of a new transmission line connecting the SPS area with the rest of the SPP footprint.  According to Cage Ranch, on July 26, 2022, the SPP Board of Directors approved a notice to construct the Crossroads-Hobbs-Roadrunner 345 kV transmission line (Crossroads

---

[50] Cage Ranch Amended Complaint and Waiver Request at 5-6.

[51] *Id.* at 6-7.

[52] *Id.* at 7-10.

Roadrunner Line) as part of the 2021 ITP assessment to resolve the reliability needs identified in the SPS area.[53]

47.     Cage Ranch argues that SPP failed to account for the Crossroads Roadrunner Line when evaluating the study group in the DISIS Phase 2 study.  Cage Ranch alleges that the DISIS Manual acknowledges that SPP should account for changes that occur after the base case models are created, such as projects approved through the ITP process, that may have an impact on the study results.[54]  Cage Ranch alleges that incorporation of the Crossroads Roadrunner Line into the DISIS study prior to evaluating the responsibility of Group 5 resolves the non-convergence issues identified by Cage Ranch and eliminates the need for the Crossroads-Eddy County Upgrades.  Cage Ranch argues that SPP assigned Cage Ranch and the other Group 5 projects the costs associated with network upgrades that were duplicative of solutions that had been identified through the regional planning process and approved by the SPP Board of Directors.  According to Cage Ranch, after its interconnection requests had been deemed withdrawn, SPP performed a restudy of the DISIS-2017-002 study cluster and included the Crossroads Roadrunner Line in the restudy.  Cage Ranch contends that the restudy—the results of which were posted on January 24, 2023—resulted in a significant reduction in the network upgrade costs assigned to the remaining Group 5 projects and no project in the group being assigned costs related to mitigation of non-converged contingencies.[55]

48.     Cage Ranch also argues that the DISIS Phase 2 study is based on unrealistic study assumptions that artificially inflate the costs assigned to Group 5.  According to Cage Ranch, SPP employed different dispatch assumptions to the generation resources in Group 5 and those outside the study group when conducting the DISIS Phase 2 study.  Cage Ranch asserts that, for example, solar and wind resources within Group 5 were dispatched at 100% of their nameplate capacity during the summer peak and winter peak scenarios while solar and wind resources outside of the study group were dispatched at between 10% and 40% of their capacity depending on the season under consideration.  Cage Ranch contends that under SPP's 2021 ITP model, solar and wind generators are dispatched, on average, between 8% to 36% for all study groups in SPP, while those in Group 5 are dispatched between 8% and 42%.  Cage Ranch argues that because the Group 5 projects are dispatched at 100% of their capacity, this creates a situation where

---

[53] *Id.* at 10-11.

[54] *Id.* at 12 (citing DISIS Manual at 12).

[55] *Id.* at 11-12, 19-20.

the output of the Group 5 generation resources is needed to serve load across the broader SPP footprint.[56]

49.    In addition, Cage Ranch argues that the DISIS Phase 2 study shows that the net area interchange settings employed by SPP had the effect of artificially increasing the loading on paths connecting the SPS area with the rest of SPP.  According to Cage Ranch, SPP enforced net area interchange settings of 2,617 MW in exports out of the SPS area when performing the DISIS Phase 2 study for Group 5.  Cage Ranch contends that during the ITP model build process, SPP enforced net area interchange settings of negative 603 MW, which represents net imports of 603 MW into the SPS area.  Cage Ranch alleges that enforcing 2,617 MW in exports over the paths between the SPS area and the rest of the SPP footprint artificially increases loading on these paths, which leads to overloads and, ultimately, network upgrade costs, for which the Group 5 projects are assigned funding responsibility.  According to Cage Ranch, disabling net area interchange and employing dispatch assumptions that better align with the ITP process reduces the number of overloads in the SPS area by approximately 30% to 40%, and thereby eliminates approximately $20 million in network upgrade costs assigned to Cage Ranch.[57]

50.    Cage Ranch contends that SPP's assumptions stand in contrast to those employed by MISO, which disables net area interchange when conducting interconnection studies.  Cage Ranch argues that the purpose of the interconnection process is to identify the network upgrades that are necessary to mitigate any reliability issues that arise because of a customer's injection of electricity at its point of interconnection.  Cage Ranch alleges that SPP's study assumptions inappropriately transformed the DISIS Phase 2 study into an assessment of the upgrades that would be necessary to support 2,617 MW in exports from the SPS area to the rest of the SPP footprint.  According to Cage Ranch, disabling net area interchange results in net imports of 1,270 MW into the SPS area, which is directionally like the flows in the 2021 ITP model.  Cage Ranch contends that by forcing 2,617 MW of energy to be exported from the SPS area, SPP's net area interchange settings guaranteed that the paths between SPS and the rest of the SPP footprint would be overloaded.[58]  Cage Ranch alleges that SPP's assignment of the costs of upgrading lines connecting the SPS area to the rest of the SPP footprint due to SPP's study assumptions is inconsistent with the Tariff and cost causation principles, which are designed to ensure that the costs assigned to an interconnection customer reflect the costs of providing the customer with service.  Cage Ranch contends that SPP assigned costs based on an

---

[56] *Id.* at 12-13.

[57] *Id.* at 13-15.

[58] *Id.* at 15-17.

assessment that had no relationship to the service that these interconnection customers requested.[59]

51.    Cage Ranch argues that SPP's allocation of network upgrade costs—based on a flawed study model and unreasonable study assumptions—is unjust and unreasonable. Cage Ranch alleges that, under Commission policy and the Tariff, interconnection customers may be allocated only the cost of network upgrades that would not be needed "but for" the customer's interconnection.  According to Cage Ranch, the Commission has found that this principle prohibits a transmission provider from assigning interconnection customers the costs of facilities necessary to resolve pre-existing reliability issues or that have been rendered moot by facilities approved through the regional planning process.[60] Cage Ranch contends that SPP's decision to assign Cage Ranch and other interconnection customers the costs of resolving non-convergence issues arising from the Crossroads contingency after SPP already identified the need for a regional solution to address this same issue is inconsistent with these requirements.[61]

52.    Cage Ranch also argues that the courts have recognized that the just and reasonable standard incorporates the cost causation principle, which requires that the costs allocated to a customer be roughly commensurate with the costs caused by or benefits received by a customer.  Cage Ranch contends that it did not cause the need for the Crossroads-Eddy County Upgrades.  Cage Ranch alleges that the need for the Crossroads-Eddy County Upgrades was driven by non-convergence and voltage collapse issues that pre-date the interconnection of the Project and that were present in the base case in the DISIS Phase 2 study.[62]

53.    In addition, Cage Ranch contends that SPP ignored non-convergence and voltage collapse issues present in the base case, which is inconsistent with the Tariff requirement that SPP conduct interconnection studies with a model that reasonably reflects anticipated system conditions.[63]

54.    Cage Ranch argues that the net effect of SPP's actions was that the security that the Group 5 projects were asked to provide following the DISIS Phase 2 study was not

---

[59] *Id.* at 20.

[60] *Id.* at 17-18 (citing *Sw. Power Pool, Inc.*, 171 FERC ¶ 61,068 (2020) (April 2020 Order)).

[61] *Id.* at 18.

[62] *Id.* at 19.

[63] *Id.* (citing SPP Tariff, attach. V, §§ 1, 2.4, 8.4.2)).

based on an accurate or reasonable assessment of the costs necessary to provide these interconnection customers with interconnection service. According to Cage Ranch, when the Commission accepted SPP's security posting requirement, the Commission stated that the security requirement must reasonably reflect the actual costs of the network upgrades necessary for the customer's interconnection to ensure that customers are not required to make excess financial commitments during the interconnection process.[64] Cage Ranch argues that the security amounts required here reflect the cost of solutions necessary to address regional reliability issues that previously had been identified through the regional planning process and to support transfer capability within the SPP footprint.[65]

55.    Cage Ranch contends that a timely and orderly study process requires accurate study results. Cage Ranch argues that interconnection customers can make informed business decisions only if the studies that SPP conducts provide a reasonably accurate assessment of the network upgrades that would not be constructed "but for" the interconnection of the customers. Cage Ranch alleges that SPP's decision to finalize the DISIS Phase 2 study based on a defective study that inappropriately inflated the costs assigned to the Group 5 projects sent an inaccurate signal for these developers to abandon their projects at a time when additional generation in the SPS area is needed to meet long-term reliability needs.[66]

### d.    SPP's Answer to Amended Complaint

56.    SPP argues that there are no network upgrades assigned for system intact non-convergence issues in the transfer case. SPP avers that Cage Ranch is confusing non-convergence in the pre-transfer case with non-convergence in the base case and is also confusing system intact conditions with contingency conditions. SPP asserts that the DISIS Phase 2 study results indicate that a non-convergence occurs for the Crossroads contingency in the transfer case. SPP contends that any non-convergence issues under either system intact or contingency conditions observed in the pre-transfer case are irrelevant. SPP also contends that the only relevant constraints are those identified in the transfer case where at least one interconnection request in the current study cluster has an impact at or above the transfer distribution factor threshold for allocation of cost.[67]

57.    SPP argues that Cage Ranch also fails to recognize the differences between the ITP models included in the 2021 ITP report and the models used for the purposes of

---

[64] *Id.* at 20-21 (citing *Sw. Power Pool, Inc.*, 167 FERC ¶ 61,275 (2019)).

[65] *Id.* at 21.

[66] *Id.* at 21-24.

[67] SPP Answer to Amended Complaint at 5-6.

conducting the DISIS.  SPP asserts that while it uses the ITP base cases as a starting point to develop the models used in the DISIS process, SPP makes certain adjustments necessary to conduct interconnection studies.  SPP states that, specifically, the ITP power flow models are modified to create a base model set from which the DISIS study model can be created.[68]  According to SPP, the DISIS analysis uses year 2 summer peak and year 5 light load summer peak and winter peak from the ITP model set.  SPP contends that Cage Ranch looks to years 5 and 10 when arguing that the ITP base case models "blow up," but SPP does not use year 10 models from the ITP in the DISIS and the single instance of non-convergence in year 5 can be resolved by adjusting reactive device settings.[69]

58.     SPP asserts that the DISIS Phase 2 study results indicate that the non-convergence at issue in Cage Ranch's amended complaint occurred for the P1 contingency of the loss of Crossroads to Eddy County 345 kV.[70]  SPP argues that the specific contingency causing the non-convergence in the 2021 ITP report in year 5 occurs for a P3.2 contingency.[71]  According to SPP, P3.2 contingencies require mitigation in the ITP process, whereas P3.2 contingencies are excluded from evaluation in the DISIS process.[72]  SPP argues that the P1 contingency identified in the DISIS Phase 2 study results does not cause a non-convergence in the ITP analysis requiring an upgrade.  SPP contends that because the P1 contingency does not cause a non-convergence in the ITP analysis, and because the P3.2 contingency is not evaluated in the DISIS process, it was appropriate for SPP to conclude that the P1 contingency observed in the DISIS Phase 2 study resulted from the five projects in Group 5 that had impacts above the transfer distribution factor threshold.[73]

59.     SPP also argues that the Commission concluded that SPP's practice of assigning network upgrades when a transmission facility is overloaded in the pre-transfer case prior

---

[68] *Id.* at 6-8.

[69] *Id.* at 8 (citing 2021 ITP Report § 5.2.1).

[70] A P1 contingency as defined in the North American Electric Reliability Corporation's (NERC) reliability standards involves a single contingency under normal initial system conditions.  NERC Standard TPL-001-4 at Table 1 (NERC TPL Standard).

[71] A P3.2 contingency as defined in the NERC reliability standards involves multiple contingencies where the loss of a generator unit is followed by system adjustments as an initial condition.  *Id.*

[72] SPP Answer to Amended Complaint at 9 (citing DISIS Manual § 3.2.2).

[73] *Id.*

to the addition of the interconnection request under study is just and reasonable.[74]  SPP contends that the Project had an impact that exceeds the applicable transfer distribution factor threshold on the constraint observed in the transfer case, resulting in SPP assigning network upgrades necessary to mitigate the constraint.[75]

60.      In response to Cage Ranch's arguments about the Crossroads Roadrunner Line, SPP asserts that it began the DISIS Phase 2 study on March 15, 2022, which occurred before the Crossroads Roadrunner Line was approved by the SPP Board of Directors on July 26, 2022.  SPP contends that the DISIS Manual prescribes inclusion in the base case of only those network upgrades that have received approval pursuant to the applicable tariff planning process.[76]  SPP also contends that the Tariff provides only for network upgrades that are part of the current SPP transmission expansion plan, as well as those upgrades currently assigned to active prior-queued interconnection requests to be applied as contingent facilities in the DISIS process.[77]  SPP asserts that, in accordance with those requirements, SPP does not include projects in its study models as a solution until the SPP Board of Directors approves a regional project.  SPP contends that excluding the Crossroads Roadrunner Line was appropriate and does not mean that the study models used for the DISIS Phase 2 study were flawed or that costs for network upgrades assigned to Cage Ranch were duplicative of solutions that had been previously identified and approved.[78]

61.      SPP states that, following the close of Decision Point 2, SPP identified a need to conduct a restudy of the DISIS-2017-002 study cluster due to the withdrawal of equally-queued projects.  SPP states that it did not include the interconnection requests for the Project in the DISIS-2017-002 restudy because the interconnection requests were deemed withdrawn after Decision Point 2 for failure to meet Cage Ranch's financial security requirements.[79]  SPP asserts that, because the SPP Board of Directors had approved the Crossroads Roadrunner Line prior to SPP performing the restudy, SPP included it in the restudy.  According to SPP, the restudy resulted in fewer upgrades and reduced network

---

[74] *Id.* at 10 (citing *Sw. Power Pool, Inc.*, 180 FERC ¶ 61,159, at PP 38-39 (2022) (September 2022 Order), *order on reh'g*, 182 FERC ¶ 61,083 (2023) (February 2023 Rehearing Order)).

[75] *Id.*

[76] *Id.* at 11 (citing DISIS Manual § 3.2.1).

[77] *Id.* at 11-12 (citing SPP Tariff, attach. V, § 3.8).

[78] *Id.* at 12.

[79] *Id.* at 17.

upgrade costs assigned to the remaining Group 5 projects. SPP also argues that the fact that the SPP Board of Directors had approved the Crossroads Roadrunner Line was well known and publicly noticed for all interconnection customers, including Cage Ranch, to factor into their decision-making during Decision Point 2. SPP asserts that had Cage Ranch met the Decision Point 2 requirements and elected to remain in the queue, those costs would almost certainly have been significantly reduced in the DISIS Phase 2 restudy as a result of the approval of the Crossroads Roadrunner Line.[80]

62.      SPP argues that the generation dispatch assumptions used to conduct the DISIS Phase 2 study were reviewed and approved through SPP's stakeholder process. SPP contends that Cage Ranch inappropriately compares the dispatch of wind and solar generators in the DISIS study process to those in the ITP. SPP explains that the ITP is used to evaluate the performance of the transmission system under specific season conditions using a generator dispatch that reflects both the expected usage of the system and contracted firm transmission service reservations. SPP asserts that, in accordance with Order No. 845,[81] SPP's GIP requires that new interconnection requests be studied at the level of interconnection service requested.[82]

63.      According to SPP, it is not practical to study all requests in a single DISIS cluster at 100% of their requested level simultaneously in a single model set. SPP asserts that it segments the footprint into study groups and studies one group at a time so that all interconnection requests within one study group (i.e., in-group) can be studied at the requested level of interconnection service while those in adjacent groups (i.e., out group) are dispatched at lower levels.[83] SPP states that the dispatch levels for the out-group renewable generators in the DISIS were chosen to be in the same general range as the dispatch levels used for renewable generators in the ITP model.[84]

64.      SPP disputes Cage Ranch's argument that the net area interchange settings used by SPP artificially increased the loading paths connecting the SPS area. SPP asserts that the area interchange is a function of the generation dispatch assumptions used in the study

---

[80] *Id.* at 12.

[81] *Reform of Generator Interconnection Procs. & Agreements*, Order No. 845, 163 FERC ¶ 61,043 (2018), *order on reh'g*, Order No. 845-A, 166 FERC ¶ 61,137, *errata notice*, 167 FERC ¶ 61,123, *errata notice*, 167 FERC ¶ 61,124, *order on reh'g*, Order No. 845-B, 168 FERC ¶ 61,092 (2019).

[82] SPP Answer to Amended Complaint at 13.

[83] *Id.* at 13-14 (citing DISIS Manual § 3.1).

[84] *Id.* at 14.

and the DISIS Manual calls for area interchange to be enabled during model build and for system intact analysis.[85]  SPP argues that with more than 3,000 MW of new generation from the Group 5 projects in the DISIS Phase 2 study, there would need to be a significant export from that group in order to balance generation with the available load and losses within the group.  SPP contends that the generation dispatch assumptions are different between the ITP studies and DISIS studies, which explains why the area interchange values are different between the studies.  SPP also contends that the assumptions are stakeholder approved, publicly posted, and applied consistently and in a non-discriminatory manner to all DISIS studies.[86]

### e.      1000 Mile Solar's Answer to Amended Complaint

65.     1000 Mile Solar states that it is developing a 300 MW solar generating facility located near Denver City, Texas and its project is in Group 5.  1000 Mile Solar asserts that the Commission should deny Cage Ranch's amended complaint and waiver request. 1000 Mile Solar states that it agrees with SPP that SPP conducted the DISIS Phase 2 study in accordance with the Tariff and related study manuals.  1000 Mile Solar also argues that granting the amended complaint would inject too much uncertainty into the DISIS-2017-002 study cluster and other subsequent, pending study clusters under review by SPP.  1000 Mile Solar contends that if the Commission grants Cage Ranch's amended complaint, the other projects in Group 5, including 1000 Mile Solar, will suffer direct harm to their interconnection queue positions, financial commitments, and project developments.[87]

### f.      Cage Ranch's Answer to SPP's and 1000 Mile Solar's Answers

66.     Cage Ranch disputes SPP's and 1000 Mile Solar's claims that SPP followed its procedures in the DISIS Manual.  Cage Ranch contends that, if the applications of SPP's procedures that have not been filed with the Commission lead to a result that is inconsistent with the Tariff and cost causation principles, then those procedures are unlawful.[88]

67.     Cage Ranch contends that:  (1) the occurrence of the Crossroads contingency in the pre-transfer case leads to voltage collapse that prevents the model from reaching a

---

[85] *Id.* (citing DISIS Manual § 3.2.2).

[86] *Id.* at 14-15.

[87] 1000 Mile Solar Answer to Amended Complaint at 2-5.

[88] Cage Ranch Answer to SPP's and 1000 Mile Solar's Answers at 3.

valid solution (i.e., non-convergence); (2) because these issues are not resolved in the pre-transfer case or otherwise screened out, the occurrence of the Crossroads contingency results in voltage collapse and non-convergence in the transfer case; and (3) the DISIS Phase 2 study results show that the Group 5 projects were allocated significant costs associated with constructing facilities to resolve non-convergence that occurs due to the Crossroads contingency, which is the same non-convergence that SPP acknowledges is present in the pre-transfer case.[89]

68.    Cage Ranch contends that, contrary to SPP's assertion that the Commission has found SPP's practice to be just and reasonable, the facts here are distinguishable from the facts in the September 2022 Order because this case does not involve the allocation of cost responsibility for resolving transmission facility overloads present in the pre-transfer case. Cage Ranch argues that, instead, this case concerns SPP's assignment of the costs of resolving non-convergence associated with voltage collapse that is present in the pre-transfer case. Cage Ranch alleges that this distinction matters because applying a flow-based methodology, such as SPP's transfer distribution factor thresholds, in the presence of pre-existing non-convergence and voltage collapse cannot provide an accurate assessment of an interconnection customer's impact on a constraint or the broader transmission system, whether applied pre- or post-contingency. Cage Ranch argues that the fact that non-convergence occurs during the Crossroads contingency in the pre-transfer case means that the power flow solution diverges and does not reach a valid solution before the addition of any of the Group 5 projects. Cage Ranch asserts that therefore, the interconnection customer did not cause the non-convergence. In addition, Cage Ranch argues that applying SPP's transfer distribution factor allocation methodology to post-contingency non-converged cases cannot provide an accurate assessment of cost responsibility because the contribution of the Group 5 projects on a given line cannot be determined in a non-converged case. Cage Ranch contends that the presence of voltage collapse and non-convergence renders SPP's transfer distribution factor methodology incapable of accurately allocating costs.[90]

69.    Cage Ranch also argues that, in the September 2022 Order, the Commission found that there was no evidence that the facilities at issue would be needed "but for" the interconnection of the interconnection customers at issue. Cage Ranch contends that, in this case, there is evidence that transmission upgrades are needed to address non-convergence and voltage support issues present in the SPS area, even if the Group 5 projects were never constructed.[91]

---

[89] *Id.* at 4.

[90] *Id.* at 6-8.

[91] *Id.* at 8.

70.     In response to SPP's argument that it made certain adjustments necessary to the ITP base cases to conduct the DISIS Phase 2 study, Cage Ranch argues that SPP fails to identify any specific adjustments that were made to the study models used for the Group 5 projects or how these adjustments ensured that the issues present in the SPS area did not result in these projects being allocated the costs of resolving regional issues.  Cage Ranch also argues that SPP focuses on a limited subset of the issues present in the base case and the SPS area that were identified in the 2021 ITP model.  Cage Ranch argues that given these additional issues, including base case overloads of key interfaces used to control voltage within the SPS area, it is unsurprising that the simulation of the Crossroads contingency would lead to voltage collapse and non-convergence in models premised on the 2021 ITP base cases.[92]

71.     Cage Ranch argues that, although the 2021 ITP model only observed a single instance of non-convergence in the Year 5 base cases, it was non-convergence in one of the year 5 study cases of the DISIS Phase 2 study that was used as the basis for allocating the Group 5 projects over $100 million in costs associated with the Crossfield-Eddy County Upgrades.  Cage Ranch also argues that, if the non-convergence present in the base case models that were used to evaluate the Group 5 projects could be resolved through adjustments to reactive device settings and other modeling parameters, SPP should have made similar adjustments to resolve the non-convergence issues in the DISIS Phase 2 study.[93]

72.     According to Cage Ranch, SPP argues that the DISIS Manual does not require SPP to conduct an alternating current (AC) contingency analysis of the pre-transfer case.  Cage Ranch alleges that SPP's position stands in contrast to section 5.2.1 of the 2021 ITP report where SPP conducted an AC contingency analysis of the base case, identified thermal and voltage violations occurring under contingency conditions, and then adjusted the model to resolve these issues to the extent possible prior to conducting its needs assessment.  Cage Ranch contends that there is no justification for applying less rigorous modeling standards to the interconnection process then are applied in the ITP process.  Cage Ranch argues that SPP's decision to not conduct an AC analysis of the pre-transfer case and then to assign the costs of resolving non-convergence to the Group 5 projects was unjust and unreasonable.[94]

73.     Cage Ranch alleges that, on January 25, 2022, the SPP Board of Directors approved the 2021 ITP Assessment Plan containing the Crossroads Phantom Line to address voltage support issues in the SPS area.  According to Cage Ranch, the SPP Board

---

[92] *Id.* at 9-10.

[93] *Id.* at 10-11.

[94] *Id.* at 11-12.

of Directors elected to defer issuance of a notice to construct the Crossroads Phantom Line to permit further evaluation and refinement of the line. Cage Ranch contends that it was known that a transmission upgrade was needed to address voltage support issues in the SPS area at the time SPP commenced the DISIS Phase 2 study. Cage Ranch alleges that the Commission has recognized that the "but for" principle prohibits a transmission provider from allocating interconnection customers the costs of resolving identified, regional needs.[95] Cage Ranch also argues that SPP's position that Cage Ranch should have posted its FS3 payment with the expectation that SPP would incorporate the Crossroads Roadrunner Line into the study is unreasonable. Cage Ranch represents that it had no reason to believe that the SPP Board of Directors' approval of the Crossroads Roadrunner Line would result in this line being incorporated into the study models for the Group 5 projects.[96]

74.     According to Cage Ranch, SPP claims that comparing the dispatch assumptions used in the interconnection process to those used in the ITP process is inappropriate. However, Cage Ranch argues that SPP fails to explain why interconnection customers being evaluated through the interconnection process must be studied at a level that SPP staff itself have described as implausible while the need for regional facilities is evaluated using more realistic study assumptions that better align with the practices employed by other regions.[97]

75.     Cage Ranch argues that in cases where a transmission provider's unjust, unreasonable, or unlawful acts resulted in certain interconnection customers being wrongfully deprived of their queue positions or being studied using incorrect assumptions, the Commission has found that the appropriate equitable remedy is to restore the interconnection customers to the position that they have been in absent the transmission provider's actions. Cage Ranch alleges that to restore the Group 5 projects to the position that they would have been in but for SPP's actions, these interconnection customers must be granted an opportunity to post security based on the results of a corrected DISIS Phase 2 study.[98]

76.     Cage Ranch contends that 1000 Mile Solar's arguments that granting the complaint will harm the Group 5 projects are unsupported. Cage Ranch argues that 1000 Mile Solar does not provide any evidence to substantiate its claims, and that the weight of

---

[95] *Id.* at 12-13 (citing *Midwest Indep. Transmission Sys. Operator*, 129 FERC ¶ 61,019 (2009)).

[96] *Id.* at 13-14.

[97] *Id.* at 16.

[98] *Id.* at 16-18.

the evidence demonstrates that resolving the issues identified by Cage Ranch would have the effect of reducing the costs assigned to the Group 5 projects in the DISIS Phase 2 study.[99]

### g.    Commission Determination

77.    We deny Cage Ranch's complaint. We find that Cage Ranch has not met its burden under FPA section 206 to show that SPP violated its Tariff or that the conduct of its studies was unjust and unreasonable because Cage Ranch did not demonstrate that the study models underlying SPP's DISIS Phase 2 study are defective. Accordingly, we find that Cage Ranch has failed to demonstrate that the network upgrades assigned to Cage Ranch in the DISIS Phase 2 study, and the associated FS3 payment amount that Cage Ranch was required to post, are unjust and unreasonable and unduly discriminatory or preferential.

78.    The core of Cage Ranch's amended complaint is the argument that, because SPP failed to resolve alleged non-convergence issues that Cage Ranch identified in the pre-transfer case before SPP finalized the DISIS Phase 2 study, the DISIS Phase 2 study is defective and cannot be used to determine the interconnection costs assigned to Cage Ranch and the other interconnection customers in the study group. However, as discussed below, we find that Cage Ranch has failed to demonstrate that the DISIS Phase 2 study is defective. We also find that SPP assigned Cage Ranch its network upgrade costs as the result of a modeling approach that SPP applies to all interconnection customers, which considers the impacts of their generating facilities on the existing transmission system and their place in the SPP interconnection queue.

79.    SPP builds its DISIS studies by using its ITP reliability assessment model as its base case model, which is subject to modification, and adding all higher-queued interconnection requests to develop the pre-transfer case.[100] The pre-transfer case is used to reach a feasible dispatch solution under system intact conditions prior to the addition of the interconnection requests in the current study cluster.[101] The interconnection requests being evaluated for the current study cluster are then added to the pre-transfer case to establish the transfer case.[102] Once the study models are developed, SPP performs a contingency analysis on the transfer case. SPP uses the transfer case to determine

---

[99] *Id.* at 18.

[100] DISIS Manual § 3.2.1.

[101] *Id.* § 3.2.1.1.

[102] *Id.*

whether additional network upgrades are required to accommodate the requested amount of interconnection service from interconnection customers in the current cluster study.[103]

80.    Cage Ranch's allegations that the DISIS Phase 2 study results are defective focus on 800 instances of non-convergence in the pre-transfer case.  But Cage Ranch identified these instances of non-convergence using its own contingency analysis on the pre-transfer case, despite SPP's explanation that the pre-transfer case is used to reach a feasible dispatch solution under system intact conditions and that the pre-transfer case is not studied for performance under contingency.[104]  Consistent with SPP's explanation and the DISIS Manual, SPP performed a contingency analysis on the transfer case, not the pre-transfer case.[105]  Therefore, any non-convergence issues identified by Cage Ranch in its own contingency analysis on the pre-transfer case are irrelevant.  The only relevant constraints are those identified in the contingency analysis on the transfer case in which one or more interconnection requests in the current study group has an impact at or above the transfer distribution factor threshold, resulting in the assignment of a network upgrade to mitigate the constraint.  Here, Cage Ranch has not provided evidence of any network upgrade identified to mitigate a constraint in the transfer case that was improperly assigned to a Group 5 project.

81.    We are unpersuaded by Cage Ranch's ITP-related arguments that seek to discredit the DISIS Phase 2 study.  For example, Cage Ranch argues that the 2021 ITP model that SPP used as the basis for the DISIS Phase 2 study was unstable and prone to voltage collapse upon the occurrence of certain contingencies, and that SPP should have used assumptions in the DISIS Phase 2 study that more closely aligned with the assumptions in the 2021 ITP model.  We disagree.  The processes for SPP's ITP and GIP are fundamentally different.  Specifically, the Commission found that the circumstances in which network upgrade costs are assigned as a result of the interconnection study process are not comparable to those in which an upgrade is identified as necessary in the ITP process, and the entities that may be assigned costs in each of these processes are not similarly situated.[106]  The objective of the ITP is not to evaluate the reliability impacts of new interconnection requests based on their requested interconnection service, but rather to evaluate the performance of the SPP transmission system under specific seasonal conditions using a generator dispatch model that reflects the expected usage of the system and contracted firm transmission service reservations.  Because these processes are

---

[103] *Id.* § 3.2.2.

[104] *Id.*; *see* SPP Answer to Complaint at 7; SPP Answer to Amended Complaint at 4-5.

[105] DISIS Manual § 3.2.2.

[106] February 2023 Rehearing Order, 182 FERC ¶ 61,083 at P 21.

fundamentally different, we find that Cage Ranch's ITP-related arguments fail to demonstrate that the DISIS Phase 2 study was defective.

82.    We disagree with Cage Ranch that SPP should have performed the DISIS Phase 2 study using either the Crossroads Roadrunner Line or the Crossroads Phantom Line, which are transmission upgrades to address voltage support issues in the SPS area that would have reduced the network upgrade costs assigned to the Group 5 projects.[107] According to section 3.2.1 of the DISIS Manual, the ITP power flow models are modified to create the base case, and updates are made to reflect changes that have occurred after the publishing of the ITP models that include, among other things, "network upgrades approved pursuant to Attachment O process."[108]  On March 15, 2022, SPP commenced the DISIS Phase 2 study.  On July 26, 2022, the SPP Board of Directors approved the issuance of a notice to construct the Crossroads Roadrunner Line.  Therefore, the Crossroads Roadrunner Line was not approved at the time SPP began the DISIS Phase 2 study and SPP properly did not include it when it commenced the DISIS Phase 2 study. Cage Ranch also argues that SPP should have included the Crossroads Phantom Line in the DISIS Phase 2 study because it was included in the 2021 ITP Assessment Plan. However, the Crossroads Phantom Line was never approved by the SPP Board of Directors and, therefore, could not have been included in the DISIS Phase 2 study.

83.    We disagree with Cage Ranch's arguments that the Group 5 projects were not the "but for" cause of the network upgrades assigned as part of the DISIS Phase 2 study.  We find that the costs of the network upgrades necessary to mitigate the constraint on the Crossroads to Eddy County line are Cage Ranch's "but for" costs because such network upgrades are required to interconnect its generating facility, and that absent its generating facility, those network upgrades would not be required.[109]  In addition, the Commission has found that SPP's practice of assigning network upgrades when a transmission facility is overloaded in the pre-transfer case prior to the addition of the interconnection request, due to impacts of higher queued interconnection requests that did not meet the applicable

---

[107] On January 25, 2022, the SPP Board of Directors approved the 2021 ITP Assessment Plan, except for the Crossroads Phantom Line, for which the SPP Board of Directors directed further evaluation prior to reconsidering it in July 2022.  As a result of that further evaluation, SPP proposed and the SPP Board of Directors approved the Crossroads Roadrunner Line as an alternative to the Crossroads Phantom Line.  SPP, Board of Directors/Members Committee Meeting Minutes of January 25, 2022 Meeting, at 4 (Jan. 2022), https://spp.org/documents/66514/board%20of%20directors_members%20committee%20minutes%202022%2001%2025.pdf.

[108] DISIS Manual § 3.2.1.

[109] February 2023 Rehearing Order, 182 FERC ¶ 61,083 at P 23.

transfer distribution factor threshold, is just and reasonable.[110]  Here, the Project had an impact that exceeds the applicable transfer distribution factor threshold on the constraint observed in the transfer case, resulting in SPP assigning network upgrades necessary to mitigate the constraint.  Further, using the ITP reliability assessment as the base case is also consistent with the "but for" standard[111] because interconnection customers are not responsible for "the cost of any facilities *that the transmission provider's regional plan dictates* would have been necessary anyway."[112]  In this case, the ITP did not identify the Crossroads-Eddy County Upgrade as a facility needed to address a reliability need in SPP's regional transmission plan.

84.    We are also unpersuaded by Cage Ranch's argument that the April 2020 Order supports granting the amended complaint.  Cage Ranch contends that in the April 2020 Order, the Commission prohibited a transmission provider from assigning interconnection customers the costs of facilities necessary to resolve pre-existing reliability issues or that have been rendered moot by facilities approved through the regional planning process.[113]  We believe that the facts in the April 2020 Order are distinguishable from the facts here because, here, the network upgrades assigned to the Project had not been rendered moot at the time SPP commenced the DISIS Phase 2 study.  In the April 2020 Order proceeding, SPP filed unexecuted generator interconnection agreements for a certain group of interconnection customers that reflected network upgrade cost allocation information based on results of the fourth DISIS restudy of that group, which was the most recent restudy at the time of SPP's filing.  After the fourth restudy, a higher queued interconnection customer withdrew from the queue, which triggered a fifth restudy.  SPP's fifth restudy incorporated a transmission line project—the Blackberry project—that was approved as part of SPP's 2019 ITP process after the fourth restudy was conducted and before the fifth restudy commenced.  The fifth restudy concluded that, as a result of the Blackberry project, a shared network upgrade was no longer needed for the interconnection of that group of interconnection customers.[114]  The Commission rejected the unexecuted generator interconnection agreements for those interconnection customers, finding that the allocation of network upgrade costs in the unexecuted generator interconnection agreements were based on a shared network upgrade that was no longer needed and was not going to be

---

[110] *Id.* PP 19-20.

[111] *Id.* P 22 (citing September 2022 Order, 180 FERC ¶ 61,159 at P 40).

[112] *Salt Creek Solar, LLC v. Sw. Power Pool, Inc.*, 180 FERC ¶ 61,116, at P 71 (2022) (emphasis added).

[113] Cage Ranch Amended Complaint and Waiver Request at 17-18.

[114] April 2020 Order, 171 FERC ¶ 61,068 at P 5.

constructed.[115]  Here, SPP performed the DISIS Phase 2 study and allocated Cage Ranch the costs of network upgrades needed for the interconnection of the Project based on the results of the DISIS Phase 2 study.  As discussed above, the Crossroads Roadrunner Line—the project that Cage Ranch argues renders its allocation of network upgrade costs unnecessary—was not approved at the time SPP began the DISIS Phase 2 study, and SPP appropriately did not include it.  Therefore, the network upgrades assigned to the Project had not been rendered moot by the Crossroads Roadrunner Line in the DISIS Phase 2 study.[116]

85.    Cage Ranch also argues that its FS3 payment amount is unjust and unreasonable because there is no link between the amount of financial security required and the costs of the network upgrades that are necessary to accommodate the interconnection of the Project.  However, Cage Ranch's argument is premised on its allegation that the DISIS Phase 2 study was defective.  Because we find that the DISIS Phase 2 study was not defective, Cage Ranch's argument that its FS3 payment amount is unjust and unreasonable fails.

86.    We also disagree with Cage Ranch's argument that by requiring it to post at-risk financial security to maintain its queue position without first being able to meaningfully challenge the accuracy of the study, SPP violated the notice provisions of the FPA.  To the contrary, the Tariff provides prior notice of the rate, terms, and conditions of SPP's open access transmission service, including its deadlines and processes under the GIP.[117]  As relevant here, SPP posted the initial draft results of the DISIS Phase 2 study on August 15, 2022, and provided interconnection customers until August 26, 2022, to review and provide comments on the initial study results.[118]  SPP then posted the results of DISIS Phase 2 study on August 29, 2022.  Decision Point 2 commenced on August 30, 2022, and ended on September 20, 2022.[119]  By Cage Ranch's own admission, SPP met with Cage Ranch following the posting of the initial draft DISIS Phase 2 study results and responded to Cage Ranch's email following the posting of the DISIS Phase 2 study

---

[115] *Id.* P 61.

[116] Following the DISIS Phase 2 Study, SPP conducted a DISIS Phase 2 restudy that included the Crossroads Roadrunner Line.  According to SPP, had Cage Ranch posted its FS3 payment and remained in the queue, the network upgrades costs assigned to Cage Ranch would likely have been reduced in the DISIS Phase 2 restudy.  SPP Answer to Amended Complaint at 12.

[117] SPP Tariff, attach. V, §§ 1-15.

[118] Cage Ranch Complaint and Waiver Request at 11-12.

[119] *Id.* at 13.

results.[120]  Therefore, Cage Ranch has not demonstrated that SPP failed to provide adequate notice of the DISIS Phase 2 Study results or otherwise prohibited Cage Ranch from challenging those results pursuant to the deadlines and processes under the Tariff.

## 2.     Waiver Request

### a.     Cage Ranch's Waiver Request

87.     Cage Ranch states that, to the extent necessary, it requests waiver of the Decision Point 2 deadline in GIP section 8.5.2 and the withdrawal provisions in GIP section 3.7 to allow Cage Ranch to make a final decision as to whether to proceed with its interconnection requests after the Commission renders a decision on Cage Ranch's complaint and SPP corrects the alleged defects in the study.  Specifically, Cage Ranch requests waiver of these provisions until 15 business days after the later of:  (1) the date that SPP posts a DISIS Phase 2 study that has been modified to correct the issues identified by Cage Ranch; or (2) the date that the Commission issues an order denying the complaint.  Cage Ranch argues that to the extent that either of its interconnection requests have been withdrawn by the time that the Commission rules in this proceeding, then those interconnection queue positions should be restored upon Cage Ranch satisfying the Decision Point 2 posting requirements.[121]

88.     Cage Ranch asserts that its waiver request meets the Commission's criteria for granting waiver.  First, Cage Ranch states that its waiver request is made in good faith. Cage Ranch asserts that it has invested significant time and resources into pursuing interconnection service and has consistently met applicable financial security posting and milestone requirements through the multi-year study process, including posting approximately $6.7 million in financial security and deposits.  Cage Ranch also states that it made multiple attempts to resolve its concerns prior to the deadlines for posting the FS2 and FS3 payments.  As described above, Cage Ranch alleges that it identified issues of non-convergence in the DISIS Phase 1 study, which Cage Ranch represents that SPP acknowledged and committed to correct in the DISIS Phase 2 study.  Cage Ranch argues that it found issues of non-convergence in the DISIS Phase 2 study and reached out to SPP to resolve them, but SPP finalized the defective DISIS Phase 2 study, which placed Cage Ranch in the position of choosing between withdrawing from the interconnection queue or posting its FS3 payment.[122]

---

[120] *Id.* at 12, 17-18.

[121] Cage Ranch Complaint and Waiver Request at 27.

[122] *Id.* at 28-29.

89.    Second, Cage Ranch asserts that its waiver request is limited in scope because it is a one-time waiver of GIP sections 3.7 and 8.5.2 to preserve Cage Ranch's interconnection requests.[123]

90.    Third, Cage Ranch argues that its waiver request resolves a concrete problem. Cage Ranch contends that the requested waiver would avoid the loss of Cage Ranch's interconnection queue positions due to SPP's decision to move forward with a defective DISIS Phase 2 study.  Cage Ranch states that the Commission has found that granting waiver of a GIP deadline addresses a concrete problem where granting waiver would prevent the loss of a queue position.[124]  Cage Ranch asserts that, absent waiver, Cage Ranch would lose the value of the investments it has made in connection with the development of the Project, including land acquisitions and development costs.[125]

91.    Fourth, Cage Ranch argues that granting waiver will not cause any undesirable consequences, such as harming third parties, because it will reduce the risk that other interconnection customers will be allocated additional network upgrade costs due to the withdrawal of Cage Ranch's interconnection requests.  Cage Ranch avers that if Cage Ranch's interconnection requests are withdrawn, it is likely that the costs currently assigned to the Project will be reallocated to other interconnection customers within the DISIS-2017-002 study cluster.  In addition, Cage Ranch contends that, because the Tariff acknowledges that a queue position may be restored following resolution of a dispute, interconnection customers are on notice that an interconnection customer's queue position that is lost due to a dispute may later be restored.[126]

### b.    SPP's Response

92.    SPP argues that the Commission should deny Cage Ranch's waiver request because it is not limited in scope, does not address a concrete problem, and would result in harm to other interconnection customers.  SPP also contends that Cage Ranch has not provided evidence that it is uniquely situated from other interconnection customers in the

---

[123] *Id.* at 30.

[124] *Id.* (citing *Lookout Solar Park I, LLC*, 176 FERC ¶ 61,100 (*Lookout Solar*), *order on reh'g*, 177 FERC ¶ 61,127 (2021)).

[125] *Id.* at 30-31.

[126] *Id.* at 31.

DISIS-2017-002 study cluster and should not be granted a risk-free option to be re-instated into the interconnection queue after the Decision Point 2 deadline.[127]

93.     Specifically, SPP contends that Cage Ranch's waiver request is not limited in scope because it ignores the impact on other interconnection customers in the study cluster and on SPP's ability to administer the Tariff.  According to SPP, the Decision Point 1 and Decision Point 2 milestones are necessary for SPP to determine which interconnection requests to include in the next phase of the study process and to help provide accurate cost estimates for other interconnection customers in the queue.  SPP argues that, in a cluster-based study process, Cage Ranch cannot be allowed to re-establish its Project in the queue after the Decision Point 2 deadline without causing irreparable harm to other interconnection customers and destroying the finality of the Tariff's definitive milestones within the study process.[128]

94.     SPP disputes Cage Ranch's claim that the waiver request would address the concrete problem of losing Cage Ranch's queue positions due to SPP's decision to move forward with a defective DISIS Phase 2 study.  SPP asserts that the models used by SPP to conduct the study were not defective and the network upgrades were appropriately assigned to the Project.  SPP contends that, like all other interconnection customers in the study cluster, Cage Ranch had the opportunity to proceed in the study process, opted to not provide its FS3 payment, and thus cannot subsequently expect to be relieved of that decision.[129]

95.     In addition, SPP contends that granting Cage Ranch's waiver request will have undesirable consequences for other interconnection customers.  According to SPP, all other interconnection requests included in the DISIS-2017-002 study cluster have met the Decision Point 1 and Decisions Point 2 milestones.  SPP argues that if Cage Ranch can re-establish its project in the queue after the Decision Point 2 deadline, SPP may have no choice but to conduct a restudy for the interconnection customers in the cluster, which would cause further delays and additional study costs to other interconnection customers in the cluster.  SPP also argues that interconnection customers who elected to remain in the queue after Decision Point 2 made that decision without knowing whether Cage Ranch would remain in the study.  SPP asserts that, therefore, whether any individual interconnection customer may be better off if Cage Ranch is reinstated in the queue was

---

[127] SPP Answer to Complaint at 19-21.

[128] *Id.* at 21-22.

[129] *Id.* at 22-23.

not determinative to those interconnection customers who elected to remain in the study.[130]

**c.      Commission Determination**

96.      We deny Cage Ranch's request for waiver of GIP sections 3.7 and 8.5.2.  The Commission has granted waiver of tariff provisions where:  (1) the applicant acted in good faith; (2) the waiver is of limited scope; (3) the waiver addresses a concrete problem; and (4) the waiver does not have undesirable consequences, such as harming third parties.[131]  We find that the circumstances of Cage Ranch's waiver request do not satisfy these criteria.

97.      Specifically, we find that Cage Ranch has not demonstrated that the loss of its queue positions due to SPP's decision to finalize the DISIS Phase 2 study is a concrete problem that warrants waiver of the Tariff.  Cage Ranch argues that the DISIS Phase 2 study is defective and that SPP's decision to finalize the defective DISIS Phase 2 study resulted in the loss of Cage Ranch's queue positions.  Contrary to Cage Ranch's argument that it lost its queue positions due to SPP's actions, Cage Ranch's queue positions were withdrawn due to Cage Ranch's failure to timely post its FS3 payment.  In addition, as determined above, Cage Ranch has not shown that SPP's decision to finalize the DISIS Phase 2 study and assign interconnection costs based on that study is unjust and unreasonable or unduly discriminatory or preferential.[132]  Therefore, we find that Cage Ranch has not demonstrated that an interconnection customer having to make decisions and provide financial security based on an interconnection study that has not been shown to be defective is a concrete problem that warrants granting waiver.[133]

98.      In support of its waiver request, Cage Ranch cites *Lookout Solar* for the proposition that waiver would address a concrete problem by preventing the loss of queue positions.[134]  We believe that Cage Ranch's waiver request is distinguishable from the

---

[130] *Id.* at 23-24.

[131] *See, e.g.*, *Citizens Sunrise Transmission LLC*, 171 FERC ¶ 61,106, at P 10 (2020); *Midcontinent Indep. Sys. Operator, Inc.*, 154 FERC ¶ 61,059, at P 13 (2016).

[132] *See supra* P 77.

[133] *See, e.g.*, *1000 Mile Solar, LLC*, 181 FERC ¶ 61,108 (2022) (denying waiver request on the basis that waiver applicant did not demonstrate that its potential to lose its posted financial security payment was a concrete problem); *Invenergy Wind Dev. LLC*, 177 FERC ¶ 61,131 (2021) (same), *order on reh'g*, 178 FERC ¶ 61,169 (2022).

[134] Cage Ranch Complaint and Waiver Request at 30.

request in *Lookout Solar*, where the Commission granted waiver to Lookout Solar Park I, LLC (Lookout Solar), relying on undisputed allegations in the record of inconsistent communications and actions by SPP that contributed to Lookout Solar's queue position being withdrawn.[135]  Cage Ranch's request does not contain such undisputed allegations. Rather, the record demonstrates that SPP worked to resolve the non-convergence issues that Cage Ranch identified in the DISIS Phase 1 study as part of the DISIS Phase 2 study and engaged with Cage Ranch after posting both the draft and final versions of the DISIS Phase 2 study.[136]

The Commission orders:

(A)    Cage Ranch's amended complaint is hereby denied, as discussed in the body of this order.

(B)    Cage Ranch's waiver request is hereby denied, as discussed in the body of this order.

By the Commission.

( S E A L )


Debbie-Anne A. Reese,
Deputy Secretary.

---

[135] *Lookout Solar*, 176 FERC ¶ 61,100 at P 23.

[136] Cage Ranch Complaint and Waiver Request at 9-13, 17-18; SPP Answer at 17-18, 25-26.

**ATTACHMENT B**

184 FERC ¶ 62,049
UNITED STATES OF AMERICA
FEDERAL ENERGY REGULATORY COMMISSION

Cage Ranch Solar, LLC                                          Docket No. EL22-89-001
Cage Ranch Solar II, LLC

        v.

Southwest Power Pool, Inc.

NOTICE OF DENIAL OF REHEARING BY OPERATION OF LAW AND
PROVIDING FOR FURTHER CONSIDERATION

(July 24, 2023)

Rehearing has been timely requested of the Commission's order issued on
May 23, 2023, in this proceeding. *Cage Ranch Solar*, *LLC v. Sw. Power Pool, Inc.*,
183 FERC ¶ 61,138 (2023). In the absence of Commission action on a request for
rehearing within 30 days from the date it is filed, the request for rehearing may be
deemed to have been denied. 16 U.S.C. § 825*l*(a); 18 C.F.R. § 385.713 (2022);
*Allegheny Def. Project v. FERC*, 964 F.3d 1 (D.C. Cir. 2020) (en banc).

As provided in 16 U.S.C. § 825*l*(a), the request for rehearing of the above-cited
order filed in this proceeding will be addressed in a future order to be issued consistent
with the requirements of such section. As also provided in 16 U.S.C. § 825*l*(a), the
Commission may modify or set aside its above-cited order, in whole or in part, in such
manner as it shall deem proper.

Debbie-Anne A. Reese,
Deputy Secretary.

# ATTACHMENT C

| Party | Primary Person or Counsel of Record to be Served | Other Contact to be Served |
|---|---|---|
| 1000 Mile Solar, LLC | Alex Goldberg<br>Eversheds Sutherland (US) LLP<br>1196 S MONROE ST<br>DENVER, COLORADO 80210<br>UNITED STATES<br>alexgoldberg@eversheds-sutherland.us | Vanessa Kwong<br>Vice President, Legal<br>Longroad Energy Management, LLC<br>220 Montgomery Street<br>Suite 860<br>San Francisco, CALIFORNIA 94104<br>vanessa.kwong@longroadenergy.com |
| 1000 Mile Solar, LLC | Joseph Hall<br>Attorney<br>Eversheds Sutherland (US) LLP<br>700 Sixth Street, NW, Suite 700<br>Washington, DISTRICT OF COLUMBIA 20001-3980<br>UNITED STATES<br>joehall@eversheds-sutherland.com | Tom Siegel<br>Vice President, Transmission<br>Longroad Energy Management, LLC<br>1700 MONTGOMERY ST STE 460<br>SAN FRANCISCO, CALIFORNIA 94111<br>tom.siegel@longroadenergy.com |
| American Electric Power Service Corporation | Stacey Burbure<br>American Electric Power Company<br>801 Pennsylvania Avenue, NW<br>Washington DC, DISTRICT OF COLUMBIA 20004<br>UNITED STATES<br>slburbure@aep.com | LaChon Turner<br>AEP COMPANIES<br>801 Pennsylvania, Avenue, NW<br>Suite 735<br>Washington, DISTRICT OF COLUMBIA 20004-2615<br>lturner@aep.com |
| Cage Ranch Solar II, LLC | Stephen Hug<br>Akin Gump Strauss Hauer & Feld LLP<br>2001 K ST NW<br>WASHINGTON, DISTRICT OF COLUMBIA 20006<br>UNITED STATES<br>shug@akingump.com | Kurt Rempe<br>National Grid Renewables Development, LLC<br>8400 Normandale Lake Boulevard, Suite 1200<br>Bloomington, MINNESOTA 55437<br>krempe@nationalgridrenewables.com |
| Cage Ranch Solar II, LLC | Scott Johnson<br>Senior Counsel<br>Akin Gump Strauss Hauer & Feld LLP<br>2001 K ST NW<br>ROBERT S. STRAUSS TOWER | |

| | | |
|---|---|---|
| | WASHINGTON, DISTRICT OF COLUMBIA 20006 UNITED STATES sdjohnson@akingump.com | |
| Cage Ranch Solar II, LLC | Stephen Hug Akin Gump Strauss Hauer & Feld LLP 2001 K ST NW WASHINGTON, DISTRICT OF COLUMBIA 20006 UNITED STATES shug@akingump.com | |
| Cage Ranch Solar II, LLC | Scott Johnson Senior Counsel Akin Gump Strauss Hauer & Feld LLP 2001 K ST NW ROBERT S. STRAUSS TOWER WASHINGTON, DISTRICT OF COLUMBIA 20006 UNITED STATES sdjohnson@akingump.com | |
| Cage Ranch Solar, LLC | Stephen Hug Akin Gump Strauss Hauer & Feld LLP 2001 K ST NW WASHINGTON, DISTRICT OF COLUMBIA 20006 UNITED STATES shug@akingump.com | Kurt Rempe National Grid Renewables Development, LLC 8400 Normandale Lake Boulevard, Suite 1200 Bloomington, MINNESOTA 55437 krempe@nationalgridrenewables.com |
| Cage Ranch Solar, LLC | Scott Johnson Senior Counsel Akin Gump Strauss Hauer & Feld LLP 2001 K ST NW ROBERT S. STRAUSS TOWER WASHINGTON, DISTRICT OF COLUMBIA 20006 UNITED STATES sdjohnson@akingump.com | |

| | | |
|---|---|---|
| Cage Ranch Solar, LLC | Stephen Hug<br>Akin Gump Strauss Hauer & Feld LLP<br>2001 K ST NW<br>WASHINGTON, DISTRICT OF COLUMBIA 20006<br>UNITED STATES<br>shug@akingump.com | |
| Cage Ranch Solar, LLC | Scott Johnson<br>Senior Counsel<br>Akin Gump Strauss Hauer & Feld LLP<br>2001 K ST NW<br>ROBERT S. STRAUSS TOWER<br>WASHINGTON, DISTRICT OF COLUMBIA 20006<br>UNITED STATES<br>sdjohnson@akingump.com | |
| Evergy Kansas Central, Inc.; Evergy Metro, Inc.; and Evergy Missouri West, Inc. | Patrick Smith<br>Corporate Counsel<br>Evergy, Inc.<br>818 S KANSAS AVE<br>TOPEKA, KANSAS 66612<br>UNITED STATES<br>Patrick.Smith@evergy.com | Denise M Buffington<br>Sr Dir Federal Regulatory Affa<br>Kansas City Power & Light Company<br>PO Box 418679<br>Kansas City,KANSAS 64141-9879<br>Denise.Buffington@evergy.com |
| Evergy Kansas Central, Inc.; Evergy Metro, Inc.; and Evergy Missouri West, Inc. | | James Flucke<br>Manager, Federal Regulatory Af<br>1200 Main<br>Kansas City, MISSOURI 64105<br>jim.flucke@evergy.com |
| Invenergy Solar Development North America LLC | Daniel Simon<br>Member<br>Clark Hill PLC<br>1001 PENNSYLVANIA AVE NW SUITE 1300 SOUTH<br>WASHINGTON, DISTRICT OF COLUMBIA 20004<br>UNITED STATES<br>dsimon@clarkhill.com | Holly Rachel Smith<br>Associate General Counsel – Re Invenergy LLC<br>1 S WACKER DR STE 1800<br>CHICAGO, ILLINOIS 60606<br>hrsmith@invenergy.com |

| | | |
|---|---|---|
| Invenergy Wind Development North America LLC | Daniel Simon<br>Member<br>Clark Hill PLC<br>1001 PENNSYLVANIA AVE NW SUITE 1300 SOUTH<br>WASHINGTON, DISTRICT OF COLUMBIA 20004<br>UNITED STATES<br>dsimon@clarkhill.com | Holly Rachel Smith<br>Associate General Counsel – Re Invenergy LLC<br>1 S WACKER DR STE 1800<br>CHICAGO, ILLINOIS 60606<br>hrsmith@invenergy.com |
| Omaha Public Power District | Joseph Lang<br>Manager, FERC & SPP Policy<br>Omaha Public Power District<br>4325 Jones Plaza<br>Omaha, NEBRASKA 68501<br>UNITED STATES<br>jelang@oppd.com | Collin J Sniff<br>Energy Regulatory Policy Manag<br>Omaha Public Power District<br>444 S 16TH STREET MALL<br>OMAHA, NEBRASKA 68102<br>cjsniff@oppd.com |
| Savion, LLC | John Lilyestrom<br>Hogan Lovells LLP<br>555 Thirteenth St., NW<br>Washington, DISTRICT OF COLUMBIA 20004<br>UNITED STATES<br>john.lilyestrom@hoganlovells.com | Derek E Sunderman<br>Vice President Transmission<br>Savion, LLC<br>422 Admiral Blvd<br>Kansas City, MISSOURI 64106<br>dsunderman@savionenergy.com |
| Solar Energy Industries Association | Melissa Alfano<br>Manager of Regulatory Affairs<br>Solar Energy Industries Association<br>1425 K Street, N.W., Suite 1000<br>Washington, DISTRICT OF COLUMBIA 20005<br>UNITED STATES<br>malfano@seia.org | Ben Norris<br>Manager of Federal Regulatory<br>Solar Energy Industries Association<br>1425 K St NW<br>Washington, DISTRICT OF COLUMBIA 20005<br>bnorris@seia.org |
| Southwest Power Pool, Inc. | Britney Lloyd<br>Attorney<br>Southwest Power Pool, Inc.<br>201 Worthen Drive<br>Little Rock, ARKANSAS 72223<br>UNITED STATES<br>Blloyd@spp.org | Tessie Kentner<br>Managing Attorney<br>Southwest Power Pool, Inc.<br>201 WORTHEN DR<br>LITTLE ROCK, ARKANSAS 72223<br>tkentner@spp.org |

| | | |
|---|---|---|
| Southwest Power Pool, Inc. | | Angela H Martin<br>Paralegal<br>Southwest Power Pool, Inc.<br>201 Worthern Drive<br>Little Rock, ARKANSAS 72223<br>amartin@spp.org |
| Southwest Power Pool, Inc. | | Michelle L Harris<br>Senior Paralegal<br>Southwest Power Pool Inc.<br>201 Worthen Drive<br>Little Rock, ARKANSAS 72223-4936<br>mharris@spp.org |
| Xcel Energy Services Inc. | bernard liu<br>Sr. Trans. Tariff Consultant<br>414 Nicollet Mall Fl 7<br>Minneapolis, MINNESOTA 55401<br>UNITED STATES<br>bernard.liu@xcelenergy.com | |